IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HAROLD BUTTS, JR.,

            Petitioner,

v.

MATTHEW CATE,

            Respondent.

NO. C11-5758 TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Harold Butts, Jr., is currently incarcerated by the California Department of Corrections and Rehabilitation at California State Prison, Solano. He filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on November 30, 2011. After conducting an initial review of the petition, the Court ordered Respondent Matthew Cate to show cause as to why the petition should not be granted. Respondent filed an answer on February 28, 2012, and Petitioner filed a traverse on March 28, 2012. After carefully reviewing the parties' written arguments, the record, and governing law, the Court now DENIES the petition for the reasons set forth below.

## I. BACKGROUND

This case stems from Petitioner's conviction of two counts of rape. The California Court of Appeal summarized the evidence presented at trial as follows:

> I. *Prosecution Case*
>
> On August 14, 2000, the victim resided with her father. She was married but her husband was in jail. The victim's father left for work around 3:30 a.m. The victim, now alone, awoke at 5:00 a.m. to discover someone standing in her room who was disguised in a blonde wig and was wearing a hooded sweatshirt.
>
> The intruder was the best friend of the victim's husband, but the victim could not make out the intruder's face and he never spoke

during the attack, so she would remain unaware of his identity for several years following the sexual assault that ensued. She could, however, see the man's wrists, which were not covered by black gloves he was wearing, and was able to conclude that he was a dark-skinned African-American. [FN2] (The victim herself is African-American.)

> [FN2] The victim acknowledged at trial that she later told police that her attacker took off the blonde wig, allowing her to discern that he was bald, though she did not get a good look at his head. She further acknowledged that defendant was not bald around the time of the crimes against her.

The man approached the victim's bed and put what felt like a knife to her neck. He climbed on top of her with his legs straddling her waist, put a pillow over her face, and began to strangle her with his hands. Fearing for her life, the victim fought back, damaging her fingernails in the process.

The victim stopped struggling as the assailant inserted his penis into her vagina. The man got up, went to the victim's dresser and retrieved some lotion, came back, and inserted his penis into her vagina again. The man also tried to insert it into her anus. [FN3] The victim's face was covered with the bed covers for the duration of these crimes.

> [FN3] In addition to the two rape charges, defendant was charged with forcible sexual penetration by a foreign object (§ 289, subds.(a)(1), (l)), namely his fingers. The prosecution had information that defendant inserted one or two fingers in the victim's anus, but at trial her testimony was equivocal. She first testified that she could not remember whether he did this or not, nor whether she had told the police he did this. Later in her testimony, after being shown a police report, she was able to recall that he did insert one or two fingers into her anus. The jury acquitted defendant on the penetration by foreign object count.

Eventually the man departed. The victim called the police and noticed that her arm was bleeding. At the hospital, she discovered stab wounds or cuts to her arm, neck, and nose. She also had strangulation marks around her neck.

After the incident, the victim moved out of her father's home. In January of 2001, as her father was cleaning out her bedroom, he discovered a bloody knife behind the bed. He donned an unused pair of latex gloves and put the knife in an unused bag. He turned the knife over to the police.

Because defendant was her husband's best friend, she knew him even though she was unable to recognize him during the sexual assault.

2

Despite the fact that the two were acquainted, she never had consensual sex with defendant.

In the latter part of 2007, defendant was identified as the assailant via a match to deoxyribonucleic acid (DNA) evidence retrieved at the crime scene. Before the police told the victim they had identified defendant, the victim had no inkling that defendant could be her assailant. She felt "[b]etrayed" and was left "disappointed, disgusted, frustrated, [and] . . . in shock" by the discovery.

In November of 2007, with defendant having been identified as a suspect, Detective John Rickert was assigned to the investigation. Rickert recorded some of the conversations he had thereafter with the victim. During one of those conversations he told the victim that defendant was a suspect in her rape. Rickert had the impression that the victim was "[v]ery surprised" to learn that the authorities had identified defendant as the perpetrator.

On November 27, 2007, Detective Rickert arrested defendant and obtained a DNA sample from him. When arrested, defendant was 5 feet 11 inches tall. He had a full head of hair.

A supervising criminalist at the crime laboratory determined that the DNA contained in the sperm cells recovered from the victim matched defendant's profile and that he was the sole source. DNA evidence from fingernail scrapings and other sources also pointed to defendant's commission of the crimes. On the other hand, the crime laboratory could not locate any fingerprints on the knife and no fingerprints were located at the crime scene either. Moreover, some DNA evidence found on the knife excluded defendant and none of it implicated him directly, although the presence of the victim's DNA on the knife implicated him circumstantially.

II. *Defense Case*

Defendant testified on his own behalf. He told jurors that he had consensual sexual intercourse with the victim at the time the victim testified he attacked her. He denied breaking into the victim's home and raping or stabbing her.

Defendant would visit the victim's husband, on which occasions defendant and the victim would talk. She liked to flirt with him. In 1997, defendant encountered the victim at a dance and she danced with him.

Several days before August 14, 2000, the date of the assault, the victim called defendant to ensure that she had the correct phone number for him and told him she would contact him later.

About 1:00 a.m. on August 14, the victim called defendant and invited him to visit. Defendant agreed, stopping at a store first to buy something to drink and condoms. He assumed that the victim was inviting him over for a sexual encounter.

3

When defendant arrived at the victim's residence around 2:00 a.m., she emerged. Getting inside defendant's vehicle, she asked if they could find a room. Defendant declined because he had not planned to stay with her all night and "wasn't about to spend any money on a room." Defendant suggested they go around the corner and the victim agreed. They parked for about 30 minutes, during which time the victim and defendant had intercourse in the backseat. Defendant wanted to use a condom but did not manage to do so. They agreed to keep their tryst a secret. This was the first and only time that defendant and the victim had sex. [FN4]

> [FN4] In her testimony, given earlier in the trial, the victim denied calling defendant in the days before August 14, 2000, to make sure that she had his correct telephone number and telling him that she would be calling later. She likewise denied calling defendant at 12:00 or 1:00 on the morning of the incident and asking him to come over to her house for a sexual rendezvous, getting in defendant's car, having consensual sex with defendant in his car in the early morning hours of August 14, and asking defendant to keep the rendezvous a secret.

Defendant later learned that the victim had been stabbed and sexually assaulted, but did not contact her. He assumed that the victim's partner would support her and defendant "was more focused on having my child" with another woman, Felicia Caprice Ellis. [FN5]

> [FN5] On cross-examination defendant acknowledged that Detective Rickert asked if he had a relationship with the victim and that he replied no. Rickert asked, "'So you never had a sexual relationship with her or a dating relationship or anything like that?'" Defendant again said no. He did not tell Rickert that he and the victim had sex in his car. On direct examination, defendant had explained that he answered in the negative because "when he said relationship, I took [it] as being boyfriend-girlfriend." Nevertheless, defendant did not take advantage of opportunities to explain to Rickert why his DNA might be found innocently inside the vagina of a woman who was alleging that defendant had raped her. When asked to explain his reticence, defendant testified, "I wasn't sure what they had on me or what the evidence was." Moreover, defendant told Rickert that he was incarcerated when the assault occurred.

Ellis provided an alibi in court for defendant. She testified that on August 14, 2000, defendant arrived at her house about 3:00 a.m. and was still there when the sexual assault, according to the victim's testimony, would have occurred.

4

> Ellis further testified that she had known defendant for many years. They had four children, one of whom was born on August 22, 2000, eight days after the sexual assault that the victim reported. Defendant was not the type of person to commit such crimes. He had never been violent or disrespectful toward Ellis or sexually imposed himself on her.
>
> Viewing a photograph of defendant and Ellis taken on August 22, 2000, to memorialize their child's birth, Ellis testified that defendant was not bald, nor was he visibly injured.
>
> A forensic DNA consultant testified as an expert witness for the defense. She had evaluated the prosecution's DNA evidence. She had found flaws in the crime laboratory's analysis of blood on the knife, including its failure to notice that part of the analysis excluded defendant as a DNA contributor. (The prosecutor and the laboratory corrected the errors once the consultant notified her about them.) In addition, the consultant had disagreed with the statistical conclusions from the testing results from the DNA obtained from Doe's fingernails and found a data entry mistake in the laboratory's work.
>
> Duane Dwight Hewitt, an inmate in the county jail at the time of his testimony, testified that he had known defendant since 1982. Hewitt was or had been friends with defendant and the victim's husband. Hewitt testified that the victim had a "flirtatious bent.

Resp. Ex. 6 at 2-6 (*People v. Butts*, Cal. Ct. App. decision, Case No. H033677 (May 24, 2010)).

On October 9, 2008, a jury in the California Superior Court for Santa Clara County found Petitioner guilty of two counts of forcible rape in violation of California Penal Code section 261(a)(2). The jury further found that Petitioner committed both counts of rape during the commission of a burglary, that he personally inflicted great bodily injury on the victim, and that he personally used a dangerous or deadly weapon, all of which constitute special circumstances giving rise to certain minimum prison terms under California Penal Code section 667.61.

On December 8, 2008, the trial court sentenced Petitioner to twenty-five years to life in state prison, consecutive to a sixteen-year determinate term. The court also imposed restitution, fees, and a fine plus penalty assessment.

Petitioner timely appealed his conviction, which the California Court of Appeal affirmed on May 24, 2010. The California Supreme Court summarily denied review on September 1, 2010.

5

1   On November 20, 2011, Petitioner filed a petition for writ of habeas corpus in this
2   Court, which has subject matter jurisdiction under 28 U.S.C. § 2254. Venue is proper in this
3   district under 28 U.S.C. § 2241(d), and the parties do not dispute that Petitioner has
4   exhausted his state remedies as to all of the claims presented in the petition. The parties also
5   do not dispute that the petition is timely.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is an "unreasonable application" of clearly established law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *Id.* at 412. However, "Ninth Circuit cases may provide persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent." *Gonzalez v. Brown*, 585 F.3d 1202, 1206 (9th Cir. 2009).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

6

1 federal law erroneously or incorrectly. Rather, that application must be objectively
2 unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and
3 citation omitted). Moreover, in conducting its analysis, the federal court must presume the
4 correctness of the state court's factual findings, and the petitioner bears the burden of
5 rebutting that presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1).

6     When applying these standards, the federal court should review the "last reasoned
7 decision" by the state courts. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Because
8 the California Supreme Court summarily denied relief, this Court looks to the California
9 Court of Appeal's May 24, 2010 written decision denying Petitioner's appeal.

## III. DISCUSSION

12     Petitioner contends that the trial court erroneously instructed the jury with CALCRIM
13 Nos. 318 and 362. Habeas relief based on an erroneous jury instruction may be granted only
14 if the challenged instruction "so infected the entire trial that the resulting conviction violates
15 due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation marks and
16 citation omitted). The challenged instruction "must be considered in the context of the
17 instructions as a whole and the trial record" and not viewed in isolation. *Id.* Petitioner is not
18 entitled to habeas relief unless the error at issue "had substantial and injurious effect or
19 influence in determining the jury's verdict"; that is, Petitioner must establish that the error
20 "resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal
21 quotation marks and citations omitted).

### A. CALCRIM No. 318

23     Petitioner first challenges the use of CALCRIM No. 318. As explained by the
24 California Court of Appeal:

> In accordance with CALCRIM No. 318, the trial court instructed the jury as follows:
>
> "You have heard evidence of [a] statement[s] that a witness made before the trial. If you decide that the witness made (that/those) statement[s], you may use (that/those) statement[s] in two ways: [¶]

7

> 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in (that/those) earlier statement[s] is true." [FN10]
>
>> [FN10] We quote the written version of the instruction. In the oral version of the instruction, the court referred to evidence of statements made "during the trial" instead of before the trial. The trial court stated, however, that it would give the jury copies of the written instructions for use during deliberations and the record offers no reason to doubt that it did so. In these circumstances (*People v. Wilson* (2008) 44 Cal.4th 758, 802) "[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*Id.* at p. 803; accord, *id.* at p. 804.)

Resp. Ex. 6 at 10. The pretrial statements at issue here are Doe's statements to Detective Rickert that she had not had consensual sex with Petitioner and that she was surprised that Petitioner had been identified as her assailant.

Petitioner contends that CALCRIM No. 318 violated his due process rights by creating an improper permissive inference that altered the burden of proof.

> Permissive inference jury instructions are constitutional . . . "so long as it can be said 'with substantial assurance' that the inferred fact is 'more likely than not to flow from the proved fact on which it is made to depend.'" [*Schwendeman v. Wallenstein*, 971 F.2d 313, 316 (9th Cir. 1992)] (quoting *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir.1992) (en banc) (citing *Ulster County v. Allen*, 442 U.S. 140, 166 n. 28, 99 S. Ct. 2213, 2229 n. 28, 60 L. Ed. 2d 777 (1979)). If, on the other hand, the inference relieves the prosecution of its burden of proving every element beyond a reasonable doubt, then the inference violates the Due Process Clause. *Ulster*, 442 U.S. at 156, 99 S. Ct. at 2224. "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis v. Franklin*, 471 U.S. 307, 316, 105 S. Ct. 1965, 1972, 85 L. Ed. 2d 344 (1985) (citing *Ulster*, 442 U.S. at 157-63, 99 S. Ct. at 2224-28).

*Hanna v. Riveland*, 87 F.3d 1034, 1037 (9th Cir. 1996).

In this case, the state appellate court rejected Petitioner's assertion that CALCRIM No. 318 "effectively told the jurors that Doe's testimony was true." Resp. Ex. 6 at 12-13. Quoting *People v. Hudson*, 175 Cal. App. 4th 1025, 1028 (2009), the court explained that use of the word "may" allowed the jury to "credit the earlier statements" but did not require them

8

to do so. *Id.* at 12. The court further noted that the instruction did not allow jurors to ignore evidence, and that use of CALCRIM No. 220, which "told the jury that it could find defendant guilty only if it concluded beyond a reasonable doubt that he committed the crimes in light of 'all the evidence' . . . vitiates any suggestion that a constitutionally implicating reasonable likelihood exists that the jury would believe CALCRIM No. 318 told it to abdicate its fact-finding role." *Id.* at 12-13 (citation omitted).

This analysis was not contrary to or an unreasonable application of Supreme Court precedent. Contrary to Petitioner's assertions, CALCRIM No. 318 does not create a permissive inference. It does not "compel the jury to accept out-of-court statements as true," nor does it "create a presumption of truthfulness of the out-of-court statements." *Solorzano v. Small*, Case No. No. 1:08-cv-01949 MJS HC, 2012 WL 1076099, at *20 (E.D. Cal. Mar. 29, 2012). Instead, it instructs the jury only that it may consider pretrial statements as evidence of the truth of those statements, not that it may, if it found that Doe made statements prior to trial, infer that the statements were true. The Court also does not find unreasonable the state court's conclusion that the instruction did not alter the burden of proof. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B. CALCRIM No. 362

Petitioner's second claim concerns CALCRIM No. 362. As the state appellate court explained:

> The prosecution sought to have the trial court instruct the jury with CALCRIM No. 362 because the prosecutor viewed the evidence as allowing the jury to conclude that defendant lied to Detective Rickert when he told him that he had never had any sexual contact with the victim, whereas in court defendant testified that the two did have a consensual sexual encounter. Defendant objected that the instruction was inapplicable to the evidence the jury had heard. The court took the matter under advisement. As the court was reading the instructions it informed counsel at sidebar that it was going to give CALCRIM No. 362 and thereupon so instructed the jury.
>
> Accordingly, the jurors were given a version of CALCRIM No. 362 that informed them: "If the defendant made a false or misleading statement relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show (he/she) was

9

aware of (his/her) guilt of the crime and you may consider it in determining (his/her) guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

Resp. Ex. 6 at 13-14.

Petitioner argued on appeal, as he does here, that this instruction violated his due process rights by "directing the jury's attention" to the possible falsity of Petitioner's initial statement to Detective Rickert that he had not had a sexual relationship with Doe, "and then telling the jury that the false testimony is proof that he knew he was guilty and that he is guilty," thus "encourag[ing] the jury to view the statements as false when it might not otherwise have done so." Pet'n ¶ 46. The appellate court rejected Petitioner's arguments, concluding that:

> [T]he instruction, read in light of all of the other instructions, tells the jury that if it concludes defendant lied at one point it "may show" consciousness of guilt, not necessarily that it does show it. Nor do we find any basis to agree with defendant that the instruction presumes his guilt. Not only does it not do so, but CALCRIM No. 220, the standard beyond-a-reasonable-doubt instruction, instructed the jury that it could find defendant guilty only if it concluded beyond a reasonable doubt that he committed the crimes. The instruction's language was neutral, neither presuming guilt, nor equating the making of a false statement with awareness of guilt, nor being unduly argumentative. Regarding the latter point, it suffices to note that *People v. Kelly* (1992) 1 Cal.4th 495, 531-532, held that CALJIC No. 2.03, which is very similar to CALCRIM No. 362, is not an improper pinpoint instruction. Certainly we do not find the whole charge ambiguous, and even if we did, we would still not find a reasonable likelihood that the jury applied CALCRIM No. 362 in a way that violated the Constitution. (*Middleton v. McNeil*, [541 U.S. 433, 437 (2004)].)

Resp. Ex. 6 at 16.

Petitioner relies on two out-of-circuit opinions that found it erroneous for a district court to give a consciousness-of-guilt instruction under the circumstances of those cases: *United States v. Littlefield*, 840 F.2d 143 (1st Cir. 1988), and *United States v. Durham*, 139 F.3d 1325 (10th Cir. 1998). However, the courts in both cases concluded that the error was harmless and did not require reversal. *Littlefield*, 840 F.2d at 150; *Durham*, 139 F.3d at 1332. Consequently, rather than bolstering Petitioner's claim, these cases instead support the

10

conclusion that any error in giving CALCRIM No. 362 did not result in actual prejudice, thereby supporting denial of habeas relief.

Another court in this district recently rejected a similar claim that CALCRIM No. 362 was "constitutionally infirm":

> Petitioner also contends that by giving [CALCRIM No. 362] the trial court implied that he had made up a story and that the jury should therefore find him guilty. (Ex. 2 at K). Contrary to Petitioner's claim, consciousness of guilt is not an inherent conclusion to be drawn from the instruction. The instruction explicitly predicates the first two sentences, relating to whether a defendant made a false or misleading statement in the first instance, with "If," and leaves the ultimate resolution of the significance of such statements to the jury. The final sentence also cautions that such statements alone cannot establish culpability. Therefore, that Petitioner's statements were willfully false or misleading is not an inherent inference of the instruction itself, and CALCRIM 362 is not constitutionally infirm. *See* [*United States v. Perkins*, 937 F.2d 1397, 1401-02 & n.2 (1991)] (upholding a similar instruction because it did not state that false exculpatory statements constitute evidence of guilt, but merely that the jury may consider them as indicating a consciousness of guilt).

*Eatmon v. Yates*, Case No. C09-0079 JSW, 2011 WL 1157288, at *7 (N.D. Cal. Mar. 29, 2011). This Court agrees and therefore finds habeas relief to be improper here. The state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law.

### IV. CONCLUSION

For all of the above reasons, Petitioner has failed to show that he is entitled to habeas relief. Accordingly, with good cause appearing, his petition for writ of habeas corpus is DENIED. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 04/16/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

11